## TILLOTSON *v.* SMITH.

If the owner of a mill turn into his mill-pond a stream which does not naturally flow into it, he is liable to an action for damages, at the suit of the owner below.

Such owner is entitled to recover nominal damages, without proof of any special damage, because it is an infringement of his right, which, by repetition, might ripen into an easement.

IN CASE, the declaration alleged that on the 15th of September, 1852, the plaintiff was seized of a certain tract of land in Lancaster, through which a certain brook, called " Caleb's brook," had immemorially run in a natural channel ; that the defendant, on that day, by a dam across a certain other brook, called " Marden's brook," which by a natural channel had immemorially run into another brook, and so into Israel's river ; and, by an artificial cut between Caleb's brook and Marden's brook, diverted the water of Marden's brook from its natural channel into Caleb's brook above the plaintiff's land, and so continually diverted it till the commencement of this suit, (which was the 17th of October, 1853,) and thereby during all that time caused the water in Caleb's brook to overflow the plaintiff's lands, &c.

On the trial upon the general issue, it appeared that Caleb's brook was a small stream, rising in the mountains, and running into Israel's river, in Lancaster. The defendant had on this brook a saw-mill, with one upright and one circular saw. The water in the brook was sufficient to carry the mill in wet seasons of the year, but not in the dry; Marden's brook was of about the same size with Caleb's, having rather more water in wet, and rather less in dry seasons of the year, and run by its natural channel into another brook which emptied into Israel's river. Some time in October, 1852, the defendant placed a slight dam across Marden's brook, and above this dam cut a channel through the natural bank of the brook, and by means of this dam and new channel, for three or four weeks turned about two thirds of the water of Marden's brook into his mill-pond on Caleb's brook, at a point about half a mile above his mill.

During the time the water of Marden's brook was so diverted, the water in Caleb's brook was not alone sufficient to carry defendant's mill; but, with the addition of the water thus turned from Marden's brook, he was able to saw, and did saw, about two thirds of the day time during that period.

The upper part of the plaintiff's land was about fifty or sixty rods below the defendant's mill, and the brook run through the land of the plaintiff a distance of about fifty or sixty rods. His land on the brook was nearly level, and a small part cultivated for corn, oats, hay and potatoes, in different years.

While the defendant sawed during the three or four weeks above mentioned, the water ran higher in the brook through the plaintiff's land than it would otherwise have done, and overflowed a few small, low places.

The defendant contended that the plaintiff had suffered no actual, appreciable damage by turning in the water, as stated above, and that he was rather benefitted than injured by it; and proposed that the question whether the plaintiff had suffered actual damage should be submitted to the jury. But the court were of opinion that the plaintiff was entitled to nominal damages; and the plaintiff consenting to take such damages, a

verdict was returned by direction of the court for nominal damages. This verdict the defendant moves to set aside.

*G. C. Williams,* with *J. W. Williams,* for the defendant.

The question substantially is, whether the defendant, by increasing the quantity of water which run through the raceway of his mill, by means of water which he had obtained from above by license for the use of his mill, is liable in an action by a proprietor of land *below* to nominal damages, when in fact the plaintiff has not suffered any actual, appreciable damage, but has been benefitted by the increase of water, as the defendant contends.

It is observable that no cases are to be found of actions by the proprietors *below* for damages for *increase* of water made to flow by them. At least, I find none. They are frequent for *diminishing* the quantity, and frequent in favor of proprietors *above* for turning back water upon them by dams, &c. In such cases it has been several times held in this State that flowing back water imports damage, as a matter of law. Such are the cases cited by the plaintiff, and the principle stated in Angell on Watercourses. But I find in no elementary book the rule distinctly stated as to *increasing* the quantity of water flowing to proprietors below. And the rule seems almost entirely founded on the reason that a repetition of the wrong might ripen into an easement. And it seems that the interest of the plaintiff may be so limited, and, by parity of reason, other circumstances of the case may be such that the principle will not apply, and the plaintiff be not entitled to recover. *Bassett* v. *Salisbury Manufacturing Co.,* 8 Fost. 438. So in *Thompson* v. *Crocker,* 9 Pick. 59, it was said that the owner of a mill was not entitled to recover on account of a mere theoretical injury to his mill, but only for actual, perceptible injury. The decisions are not exactly uniform in cases of flowing back water, to establish the principle of implied damage. But the reason for such a principle is much weaker in a case like the present. Can it be said that the *increasing* of the quantity of water is, as a matter of law, injurious to the plaintiff?

---

Tillotson *v.* Smith.

---

To have lessened it, is every where said to be so, but to have supplied *more largely* for irrigation, &c., is that necessarily injurious, and should it not be left to the jury to determine, as the case may be ? Here in this case the water was increased, not so as to run over the dam, but so as to be more than would naturally run at that (dry) season of the year, but no more than would run naturally at other seasons of the year in the old brook.

The reason for such a rule, that it might ripen into an easement by length of time, can hardly apply ; for the increase was but temporary, for a period of three or four weeks, and was in October, 1852, and then discontinued, and this suit was not brought until near a year afterwards, viz., October, 1853.

In *Whittier* v. *Cocheco Co.*, 9 N. H. 454, it is decided that an owner of a mill may draw a larger quantity of water through his gate than he is accustomed to use, if he has lawfully supplied the surplus for his own use, and causes no injury thereby to persons having rights in the stream.

This would seem at least not recognizing the doctrine that such a proceeding was an injury, as a matter of course, to all proprietors on the stream below.

Such a rule would seem to be the more unreasonable, when the question is asked, where shall it stop in its application ? If this plaintiff is injured, as a matter of law, is the next proprietor below, and so on to the ocean ; and where do we come to the point where the injury ceases to be one which the court will say entitles to nominal damages ?

Farther : is there no relaxation of so harsh a principle in favor of an enterprise of public utility, and such a beneficial use of the water as that by mills ? Must one, increasing slightly the quantity of water he shall use at his mill, (having lawfully provided the surplus,) be subjected to nominal damages in favor of every proprietor below who may choose to sue, although he cannot show that he has suffered actual, appreciable damage ?

*Whidden*, for the plaintiff.

*Aqua currit et debet currere ut currere solebat,* is the language

of the civil law. Every proprietor of lands on the banks of streams has naturally an equal right to the use of the water as it flows along by or through his lands. He cannot increase the natural flow, alter the course, or divert any portion of the stream, without a license or a grant. It must run *ut currere solebat.* He has no property in the water itself, but a simple usufruct, while it passes along. Any material change affecting the depth, current, or quantity in the stream above or below, upon a neighboring proprietor, is an invasion of right.

Marden's brook and Caleb's brook were about of a size. The defendant turned about two thirds of Marden's brook into Caleb's brook, which run through the plaintiff's land. The water of these brooks did not naturally unite. Caleb's brook was thereby made to overflow its banks in a dry time. The land was cultivated. All this was done without grant, license, or pretence of right.

In the case of *Woodman* v. *Tufts,* 9 N. H. 88, which was case for erecting a dam across Blackwater river, and overflowing the land of the plaintiff, situated above said dam, the court decided that if the defendants, without right, maintained a dam so high as to overflow the land of the plaintiff, the presumption of law was that the act was a damage, and no special damage need be shown in order to maintain the action. The same doctrine is held in *Cowles* v. *Kidder,* 4 Fost. 364.

On the question arising in this case, the authorities are believed to be quite unanimous. Angell on Watercourses, sec. 428, 9, 430, 1, 2, and 449 ; *Bolivar Manufact. Co.* v. *Neponset Manufact. Co.,* 16 Pick. 241 ; 3 Kent Com. 439, 440, 441 ; *Hobson* v. *Todd,* 4 T. R. 71 ; *Butman* v. *Hussey,* 3 Fairf. 407 ; *Mauricet* v. *Brecknock,* Doug. 491, 2 ; *Blanchard* v. *Baker,* 8 Greenl. 253 ; *Gardner* v. *Trustees of Newbury,* 2 Johns. Ch. 162 ; *Bliss* v. *Rice,* 17 Pick. 23 ; *Pindar* v. *Wadsworth,* 2 East 154 ; *Young* v. *Spencer,* 10 B. & C. 145.

BELL, J. Every owner of land situate upon a stream has a right to the natural flow of the stream ; a right to insist that the

stream shall continue to run *uti currere solebat ;* that it shall flow upon his land in its usual quantity, at its natural place, and at its usual height, and that it shall flow off his land upon the land of his neighbor below in its accustomed place, and at its usual level. This right he has as an incident to the property of his land, and he cannot be deprived of it but by grant, actual or presumptive. Whenever, by reason of the interference of the owner above, the water is diverted from his land and made to run elsewhere, or the water of other streams, naturally running elsewhere, is turned upon his land, or the water of the natural stream is made to flow upon his land at a different place from its natural channel, or at a different level, or in an unnatural manner ; and so whenever, by the acts of the owner of the land below, the water is obstructed, or drawn down, or made to run off in an unusual place, or in an unusual manner, and actual injury ensues to any material amount, the owner of the land may maintain an action for such injury. In short, if any person, above or below, shall make any change in the natural flow of a stream, to the material injury of the owner situate upon it, or by any interference shall prevent the stream from flowing, as it was wont to flow, to such injury, he is liable for the damage he may occasion. These rights are subject to the rights of the owners of the land situate above and below upon the stream, to make a reasonable use of the water upon their own land, while it is passing along the same.

The precise case before us, which is of a class of which the instances are comparatively unfrequent, that of turning a stream from its natural channel and forcing it to run in the channel of another stream, was decided in *Merrill* v. *Parker*, Coxe, (N. J.) 460, cited Ang. on Wat., p. 335. The point, as it arises in the French Law, is fully discussed in Pardessus on Servitudes, secs. 82, 85 and 88.

It seems very evident that if a man's land is materially damaged by water thrown upon it by reason of the acts of another, it can make no difference what the source of the water may be ; whether it be back water, or the flowage of the same, or the

water of another stream. The wrong consists in turning any water upon the land which does not naturally flow in that place; and it can make no difference if the water, wrongfully turned upon a man's land against his will, flows in the channel of an ancient stream, or in a course where no water flowed before, if similar damage results. *Hawell* v. *McCoy*, 3 Rawle 256, Huston, J.; *Bealey* v. *Shaw*, 6 East 213, Ellenborough, C. J.; *Mason* v. *Hill*, 3 B. & A. 304, Tenterden, C. J.; *King* v. *Tiffany*, 9 Conn. 162; 3 Kent Com. 439.

It is a long established principle of the common law, that wherever any act injures another's right, and would be evidence in future in favor of the wrong doer, an action may be maintained for an invasion of the right, without proof of any specific injury. 1 Wms. Saund. 346, note 2, to *Mellor* v. *Spateman.* This principle has been recognized here in the case of *Woodman* v. *Tufts*, 8 N. H. 91; *Snow* v. *Cowles*, 2 Fost. 302; *Cowles* v. *Kidder*, 4 Fost. 379; *Bassett* v. *Salisbury Manufact. Co.*, 8 Fost. 455. In the last case it was held that the state of the plaintiff's interest might be properly inquired into, because, if he sustained no damage in fact, and had no interest that could be affected by the danger of an accruing easement, he might not recover any damages. That is not the present case. The plaintiff appears to be owner in fee.

It is suggested that the injurious acts were continued for but a short time, and that, instead of being an injury, they were really a benefit to his land. The case of *Patrick* v. *Greenway*, cited in Sergeant Williams, note, before referred to, seems decisive as to the first. It was trespass for fishing in the plaintiff's several fishery, in which he obtained a verdict, and the court refused to set it aside, though he caught no fish, upon the ground that the act of fishing was not only an infringement of the plaintiff's right, but would be evidence of using and exercising the right by the defendant, if the act were overlooked. No infringement of the rights of another can be justified on the ground that the act is a benefit to the owner, if it is done against his will.                    *Judgment on the verdict.*